THE STATE OF DELAWARE, for the use of the Pennsylvania Railroad Company, a corporation of the State of Pennsylvania, plaintiff below, plaintiff in error, *v.* THE AETNA CASUALTY AND SURETY COMPANY, a corporation of the State of Connecticut, defendant below, defendant in error.

(*January* 23, 1929.)

WOLCOTT, Chancellor, RICE and HARRINGTON, J. J., sitting.

*John Biggs* and *John Biggs, Jr.,* for Pennsylvania Railroad Company, plaintiff in error.

*Henry Ridgely* filed a brief in support of plaintiff in error, representing other plaintiffs in cases below which were dependent upon this case.

*Robert H. Richards* and *Aaron Finger* for defendant in error.
Supreme Court, No. 6, October Term, 1927.

WOLCOTT, Chancellor, delivering the opinion of the court:

In this case no distinction has been sought to be drawn by the attorneys for the parties between charges for freight and charges for demurrage. We shall accordingly assume that no such distinction exists.

The statute under which the bond was given is of a type quite generally found in many of the states, as well as in the Federal jurisdiction. Neither at the argument nor in the briefs has any suggestion been made that the Delaware statute is in any substantial respect different in meaning and purpose from the statutes found in the other jurisdictions from which counsel have cited cases in support of their respective contentions. Indeed that no difference exists, was conceded; and we shall therefore proceed on the assumption that the concession is warranted.

The point which we are called upon to decide is whether or not transportation services of the kind referred to under the circumstances referred to constitute either the furnishing of material or the performing of labor within the meaning of the bond given under the statute. That they do not constitute the furnishing of material is plain. No contention that they do is made. It is, however, insisted by the plaintiff in error that they constitute the performing of labor within the meaning of the statute and correspondingly of the bond given in obedience thereto.

The bond being a statutory one, we are to look to the statute whose language it follows for its meaning. In examining

the statute, two questions arise in connection with its application to such a state of facts as the record in this case discloses.

First—does the service or labor of transporting materials to be used in the public work and actually used therein lie outside the protection of the statute because of the fact that the place of rendering it was distant from the site of the work? In commenting on the Federal statute applicable in cases of this kind, the court in *U. S., to Use of Sabine, etc., Co. v. Hyatt, et al. (C. C. A.)*, 92 *F.* 442, stated that "the labor which Congress intended to protect, by the act under discussion, is evidently labor used directly upon the public work, claims for which would be made by the laborers primarily against the work; thus impeding, possibly, the prosecution of the work and hampering the government officers." That case excluded from the statute's scope and consequently from the surety's obligation a charge by a common carrier for freight. The case adopts the strict construction view which is applied to mechanics' lien statutes to the effect that the labor and materials must go directly into the work and not be open to the criticism of remoteness therefrom. Subsequent cases, however, are inconsistent with this rule of strict construction as will appear from the citations of authority about to follow. Before citing these authorities it may be well to observe that their results clearly justify the remark of the court in *U. S. for Use of Hastings Co. v. Lowrance, et al. (C. C. A.)*, 252 *F.* 122, that such statutes as this and the surety bonds given thereunder "should be liberally, not narrowly, construed." See, also, *Maryland Casualty Co. v. Ohio River Gravel Co. (C. C. A.)*, 20 *F.* (2d) 514; *American Surety Co. v. Lawrenceville Cement Co. (C. C.)*, 110 *F.* 717.

Coming now to the citations of authority, we note the following cases in which the claim was allowed as within the statute and bond given thereunder: *Title Guaranty & Trust Co. v. Crane Co.*, 219 *U. S.* 24, 31 *S. Ct.* 140, 55 *L. Ed.* 72 (furnishing patterns to the contractor to be used in its moulding department to make castings which went into the vessel contracted to be built); *U. S. Fidelity & Guaranty Co. v. U. S. ex rel. Bartlett*, 231 *U. S.* 237, 34 *S. Ct.* 88, 58 *L. Ed.* 200, affirming *(C. C. A.)* 189 *F.* 339 (supplying labor

for the contractor in quarrying stone in a quarry fifty miles distant from the public work, transportation of the rock, labor of carpenters and blacksmiths in repairing cars and tracks used in the transportation, and wages of stablemen who fed and drove the horses which pulled the cars); *U. S. for Use of Hastings Co. v. Lowrance, supra* (feed furnished for horses and mules used in hauling and dumping earth for a levee); *U. S. to Use of Boyer, et al., v. Port Deposit Quarry Co., et al. (D. C.),* 272 *F.* 698 (rent of derrick or lighter used in transporting stone from quarry to place of deposit designated in contract and in depositing them there); *Taylor, et al., v. Connett, et al. (C. C. A.),* 277 *F.* 945 (rent of scows rented in New York by one who contracted with the contractor to transport stone from a quarry located a considerable distance from Cape Lookout, N. C., where contractor was building breakwater under contract with the United States); *Early & Daniel Co. v. American Surety Co. (C. C. A.),* 5 *F.* (2d) 670 (hay and livestock feed consumed by livestock used in course of construction of road); *Maryland Casualty Co. v. Ohio River Gravel Co., supra* (repair of trucks used on the work, and gasoline and oil furnished for their operation, notwithstanding they may have been supplied at a place removed from the work); *Brogan v. National Surety Co.,* 246 *U. S.* 257, 38 *S. Ct.* 250, 62 *L. Ed.* 703, *L. R. A.* 1918D, 776 (groceries and provisions furnished to contractor to board laborers, some on barges and some in tents, who worked on a channel deepening operation).

In the last-cited case, the Supreme Court uses this language— "This court has repeatedly refused to limit the application of the act to labor and materials *directly* [italics ours] incorporated into the public work." Though authority may be found to the contrary, yet we think the modern cases are in harmony with the rule thus indicated as settled in the Supreme Court of the United States.

Reason harmonizes with this result for, taking the particular case in hand as an illustration, the labor of transporting slag to be used in the construction of the road contributed as materially and substantially to the work's completion as did the labor of dumping, hauling, mixing and spreading it on the ground. The latter is impossible in the absence of the former. There would be

as much reason in excluding the one from the term "labor" performed on the work as the other. It does not seem to us that the services rendered to a contractor can be made to depend on the mere circumstance of the place where rendered for its admission into the category of labor performed in the prosecution of the work. They ought rather to depend on the nature of the services and whether they have in a proximate sense contributed to the work's prosecution and completion.

With that as the test, labor and materials have been held as not too remote under the circumstances referred to in the cases above cited. That transportation of materials for a contractor in order that he might have them on hand for incorporation in the work is the performing of labor within the meaning of the statute and the bond has been specifically held in *Title Guaranty & Trust Co. v. Crane Co., supra,* where a claim for cartage and towage was allowed, as well as the claim for drawings and patterns before referred to. In *American Surety Co. v. Lawrenceville Cement Co.* (*C. C.*), 110 *F.* 717, it was held that claims for transportation in the form of trucking and water carriage are within the term "labor" as used in the statute. And it is to be noted that in some of the cases above cited, labor and materials which were merely collateral to the labor of transporting were allowed, as for instance rent of derricks, lighters and scows.

It being once granted, as we think under the authorities it must, that services rendered to or for a contractor that bear a proximate relation to the work and materially contribute to its progress and completion, are within the protection of the statute, there can be no satisfactory ground upon which to exclude from it that particular type of proximately contributing work embraced in the descriptive term "transportation." The cases last cited find nothing peculiar in the work of transporting materials which should differentiate it from other classes of work. Nor can we think of any differentiating peculiarity in that sort of work.

We lay it down therefore as a general proposition that the labor of transporting materials for a contractor to be used and actually used in the work he has engaged to do, comes within the

meaning of the term "labor" as used in such statutes as the one before us.

Before leaving this branch of the case we pause to observe that in the *Lawrenceville Cement Company* case, last cited, though a charge for transportation was allowed, yet a distinction was suggested between labor expended in transporting for a long distance and labor expended in transporting for a short one. This distinction we are unable to accept. It seems to us to discard as a test the essential thing of proximateness to the work's advancement and to substitute therefor the purely irrelevant circumstance of length of distance over which the transportation extends. Length of the haul, upon analysis, can mean only length in time for doing the labor of transporting. No one, however, has ever suggested that the recoverability of a claim for labor ought in any way to depend upon the length of time spent in rendering it. Furthermore, if a distinction is to be drawn between a long haul and a short haul, where is the line of demarcation between the two? We confess that we do not know to what principle of reason resort ought to be had for guidance if distance of the haul is to be accepted as the test of whether it is "labor" within the statute or not. In *U. S., to Use of Wharton, etc., R. R. Co. v. Columbus Circle, Const. Corporation, et al.* (*D. C.*), 284 *F.* 155, the distinction based on the length of the haul was rejected and we think rightly so. The opinion reversing that case in *Mandel, et al., v. U. S., to Use of Wharton, etc., R. R. Co., et al.,* 4 *F.* (2d) 629, left the ruling on the long and short haul distinction untouched, because under the view taken by the Circuit Court of Appeals it was unnecessary to notice it.

Having arrived at the conclusion that labor, rendered in the transportation for the contractor of materials to be used and actually used by him in the construction of the work covered by his contract, is labor performed within the meaning of the statute and of the bond, and that this is so without regard to the length of the haul, we next turn to the question of whether there is anything peculiar to the situation of a common carrier which ought to take the transportation labor performed by it out of the protection which the general category of transportation services is entitled to enjoy.

Second, then, is a common carrier, because of anything peculiar to its situation, to be denied the benefit of the statute? The only ground upon which the suggestion rests that a common carrier is to be differentiated from other types of transporters is that it has a common law lien for its charges whereas others have not. The fact of a lien has been mentioned by way of obiter as removing the common carrier from the protection of the statute for two reasons. These we shall refer to under (a) and (b).

(a) In *U. S., to Use of Sabine, etc., Co. v. Hyatt, supra,* the court said that inasmuch as the railroad had a lien for its freight, it could not be supposed that Congress intended the act to embrace common carriers within its protective purpose. This, however, we conceive to be obiter, because the decision appears to have been based on the view that only such labor is covered by the act as is used directly upon the work and that transportation services by a carrier railroad cannot be said to have been directly rendered upon the work. There was therefore no occasion for the court to discuss the effect upon the claimant's status of the lien which it had. In the later case of *Mandel, et al., v. U. S., to Use of Wharton & N. R. Co., et al. (C. C. A.),* 4 *F.* (2d) 629, the court followed the Hyatt case. It took the view as did the Hyatt case, that freight is not within the term "labor" as used in the act, and then stated by way of obiter that the protection of a lien which the carrier enjoyed obviated the occasion for extending the act by judicial construction so as to embrace a carrier.

What those two cases have to say with respect to the non-inclusion within the term "labor" of transportation services, which we think is the ground of their decisions, cannot be accepted by us as the law. Why, we have hereinbefore stated. What they say with respect to the exclusion of a carrier from the act by reason of the lien appears to us to have been *obiter dicta.*

In the Hyatt case, the court seemed to think that the sole intent of the statute was to protect only those persons who had no other protection by way of lien. Yet, we note language in its opinion indicating that it was the purpose of the act to afford such protection that, but for its presence, the prosecution of the work would

be impeded and the government officers hampered by refusal of labor or material men to do business with the contractor, a purpose which can have no necessary logical connection with the fact of a lien for its advancement. If we are permitted to look for the statute's intent outside of the words in which it is expressed, we think that it may be said with much force that in part at least the statute's intent was as just indicated, that is to say in substance to assure all who participate in the work's progress and completion that they will be paid and need not fear to perform labor and supply materials to the contractor. If common carriers are to be denied this assurance because they have a common law lien will not the result be that materials, necessary for the orderly progress of the work, will be either withheld or often times delayed in delivery, and the state's desire for unimpeded operation be frustrated? That the giving of such assurance as this was within the intent of the act is the implication contained in the remarks of Judge Putnam in *American Surety Co. v. Lawrenceville Cement Co., supra* (approved by the Supreme Court in *Title Guaranty & Trust Co. v. Crane Co., supra*), to the effect that denial of a carrier's claim ought not to be made under circumstances that "would defeat the practical operation of the statute," or its "beneficial purpose" and "the practical ends which it is intended to accomplish." What these practical ends could be which the legislature intended to aid by the operation of the act, in the circumstances of the case which he was discussing, except the unimpeded progress of the work, we are unable to see; especially since the view of the courts, in adopting the rule of liberal construction seems to be that such acts as these are not grounded, like mechanics' lien statutes, in equitable considerations in favor of claimants, for which reason the rule of liberality of construction prevails. In other words, the protection of claimants would appear to be subsidiary to a purpose broader in scope than the mere securing of payment to them, that purpose being the facilitating of the work's uninterrupted progress to completion.

Looking therefore at this purpose which, as much as for any other purpose, the act may be said in a substantial sense to have been designed to serve, it would appear that there is more reason

to include carriers who have a lien for freight within its protection than to exclude them. We have serious doubts in our minds, as to whether there is anything by way of background to such acts as these which can enable courts to say with positiveness just what purpose their enactment was intended to serve. Our brief excursion into that field of discussion has been occasioned by the remarks of the courts in the Hyatt and Mandel cases and for the purpose of showing that the purpose may very well have been such as to include carriers who have a common law lien rather than to exclude them, as those cases if their *obiter dicta* is followed would do.

In the Mandel case, the court after saying that transportation charges by a carrier are not within the term "labor," then proceeds to say that "there is no call for the exercise of judicial construction" to include carriers within the statutory bond because of the lien they possess. This seems to us to be approaching the matter from the wrong end. It would rather seem to be more proper to say—the act embracing transportation services generally (as we think must be said under the authorities) is there anything in the situation of a transporter who happens to be able to assert a lien that excepts him from its protection? The inquiry should be, not is the act to be extended to a common carrier but, his class being generally included in it, is there anything peculiar to his situation that should exclude him from it?

As we have said, we can see nothing in the intent or purpose of the act upon which to base his exclusion. Is there any other reason why he should be excluded?

(b) A suggestion that such other reason exists is to be found in *American Surety Co. v. Lawrenceville Cement Co., supra,* where the court after calling attention to the common law lien for freight says the equitable rule should apply to defeat the carrier's claim against a surety because he "cannot give up his cargo, and enforce his claim against a mere surety, after he has so placed himself that the surety cannot be subrogated to the security which the law gave." Judge Putnam, who decided the *Lawrenceville Cement Company* case, recognized the indefensibility of this idea if allowed as a general proposition, for he circumscribed it by the following:

"The second objection, moreover, must not be carried to an extreme, otherwise it would defeat the practical operation of the statute. Every person selling materials for cash holds a lien for the purchase money until he voluntarily waives it by delivery; and every person engaged in transportation, who is not the mere servant of the owner of the merchandise transported, holds a carrier's lien, even though the carriage is of miscellaneous parcels, over short distances in the immediate locality, and at frequent, irregular intervals. Nevertheless, with reference to each, such liens are not ordinarily insisted on, and it would be an unreasonable construction of the statute to hold that it intended to interfere with the convenience of minor dealings in such methods as the usual practices establish. Therefore, as we have already stated with reference to either class, to insist on the fact that the lien is waived, and short credit given, would defeat the beneficial purpose of the statute, and the practical ends which it is intended to accomplish."

The Supreme Court in *Title Guaranty & Trust Co. v. Crane Co., supra,* approved of that portion of the above language which holds (quoting from Mr. Justice Holmes' opinion) "that in these small matters the objection if carried to an extreme would defeat the purpose of the statute, that such liens ordinarily are not insisted upon, and that it would be unreasonable to let the statute 'interfere with the convenience of minor dealings in such methods as the usual practices establish.'"

There was no approval, however, by the Supreme Court of the general proposition that it would be inequitable to permit a common carrier to waive its lien and go against the surety, on the ground that the right of subrogation would be lost to the latter. There was no occasion for the Supreme Court to examine the general proposition.

It is apparent from the two cases last cited that in some cases at least the waiver of the carrier's lien will not oust it from the right to recover from the surety. If Judge Putnam was correct in his views, carriers who waive their common law liens are to be divided into two classes—one class may hold the surety liable and the other not—the former are apparently those whose demands for freight may be said to be categorized as "minor dealings" in accordance with "usual practices," the latter all others. This appears to us to be a classification founded on an unsatisfactory distinction. What are minor dealings and what are the usual practices? We suppose only the circumstances in each case could answer that question. And we venture to say that the surety company, which is the

only interested party we are now concerned with, had no thought whatever before it executed its bond, of inquiring into the comparative importance of the prospective dealings between the contractor and carriers or the usual practices prevailing in their transactions in order to understand the measure of its liabilities. Furthermore, the same difficulty exists in finding the measure of minor as against major dealings as is encountered in discovering the measure of a long as against a short haul, before adverted to. It seems to us that freight charges for which a carrier has a common law lien are as a general class either within the bond's protection or not; and that it is as untenable in reason to sub-classify them, as was suggested by Judge Putnam, as it is impracticable in fact.

The argument that it would be inequitable to allow a carrier to surrender the lien and collect from the surety does not appeal to us. What is a carrier's lien? It is simply the right to hold the consignee's cargo until payment is made for the work of transporting it. In simple terms it is the right to withhold the enjoyment by another of the fruits of work done in his behalf until he pays therefor. The carrier is authorized by the law of liens to say in substance what an ordinary laborer or vendor of goods is in position to say, viz., pay me for my labor in advance or for my goods before delivery, otherwise you shall not enjoy the benefits of the one or possess the other. The carrier, notwithstanding the cargo is the consignee's, can similarly say—before I complete the labor of transportation by delivery to you, pay me for my work. That is all the lien is. It does not follow the goods when delivered, nor can the consignee be compelled to pay until they are delivered. Now what reason can there be in holding that a laborer or a material-man may deliver his labor or materials on credit and go against the surety in case of non-payment, but a transporter if he surrenders the cargo may not? If he may not, then this is the result, the very act of surrendering the cargo which will give rise to the debt, will relieve the surety company of its guaranty of payment, and carriers when they are afraid to extend credit to the contractor will therefore hold back the materials and obstruct the work, a result which must be inharmonious with the statute's purpose.

The thought which underlies the supposed equity in favor of the surety is this—that it has a right of subrogation which it ought not be deprived of. It seems to be a sufficient answer to this thought to say, that if the contention we are criticizing be sound, there never could arise any right of subrogation. The right, if it exists, could not possibly arise until delivery had been effected and the freight paid by the surety. Yet the moment delivery has been made, the lien is gone. The carrier having no lien, what is there the surety can be subrogated to? And if delivery is withheld and the lien retained, the carrier has no claim for its discharge against the principal and hence there is nothing to which the surety can be subrogated. Whether delivery is made or not, therefore, there is no opportunity for a right of subrogation to arise. It would seem then that the situation is entirely different from that which prevails where the creditor has a continuing lien against a debtor's property, and after waiving the lien seeks to compel the debtor's surety to pay the debt. We are unable to attach any significance to the fact of the carrier's lien in cases of the pending sort. It seems to us that the word "lien" has led to some confusion of thought whereby some of the doctrines arising from its use in certain connections have, in the course of remarks by way of obiter, been transferred to its use in other and unrelated connections.

We have found only one case that in its ruling directly bears on the proposition that waiver of a lien by a carrier's delivery of the material operates to discharge the surety in a bond such as the one now before us, and that case holds against the proposition. We have seen no case that supports it, though remarks in its support may be found. The case we just referred to is *U. S. v. Columbus Circle Construction Co. (D. C.)*, 284 *F.* 155. That case was reversed, however, by the *Mandel* case, *supra,* but on the ground, as we read the opinion, that transportation by a carrier is not "labor" within the act, a view which as we have before indicated we cannot accept. We think the lower court in the *Columbus Circle Construction Company* case was right in its conclusion, and in the views expressed in its opinion.

In conclusion, we wish to note the ruling made in the case of *Maryland Casualty Co. v. Ohio River Gravel Co. (C. C. A.)*, 20 *F.* (2d) 514. In that case it was said that the seller of materials who was the consignor, and who paid the freight in advance, even though he was under no agreement to do so, and did so because it was exacted of him by the carrier, could recover the same from the surety. If this be true, how unreasonable it would be to say that the carrier as well could not look to the surety for payment.

The judgment below will be reversed.